U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**FILED**

APR 3 0 2018

JAMES W. McCORMACK, CLERK
BY: _____ IN OPEN COURT
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA )
)
v. ) No.: 4:18CR186 BSM
)
HENRY WILKINS IV )

### PLEA AGREEMENT

The United States Attorney for the Eastern District of Arkansas, Cody Hiland, by and through Stephanie Mazzanti, Patrick C. Harris, and Ben Wulff, Assistant United States Attorneys, the United States Department of Justice, Criminal Division, Public Integrity Section, by and through Trial Attorney Marco Palmieri, and Henry Wilkins IV, defendant, represented by the undersigned counsel, hereby agree to the following terms and conditions in connection with the above referenced proceedings.

1. **GUILTY PLEA:** The defendant will waive indictment and permit the United States to proceed by Information charging the defendant with conspiracy to (a) commit bribery concerning programs receiving federal funds, and (b) devise a scheme and artifice to defraud and deprive the citizens of the State of Arkansas of their right to honest services, a violation of Title 18, United States Code, Section 371. The defendant also agrees to enter a plea of guilty to the Information. This is a Federal Rule of Criminal Procedure 11(c)(1)(A) plea agreement.

2. **ELEMENTS OF THE CRIME:** The parties agree the elements of the offense to which the defendant will plead guilty are:

A. Beginning in or about 2010 to in or about 2014, two or more people reached an agreement to commit the crime of bribery concerning programs receiving federal

1

funds, and to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the State of Arkansas of their right to honest services;

B.      The defendant voluntarily and intentionally joined in the agreement, either at the time it was first reached or at some later time while it was still in effect;

C.      At the time the defendant joined in the agreement, the defendant knew the purpose of the agreement; and

D.      While the agreement was in effect, a person or persons who had joined in the agreement knowingly did one or more acts for the purpose of carrying out or carrying forward the agreement.

The defendant agrees that he is guilty of the offense charged and each of these elements is true.

3.      **PENALTIES:**

A.      STATUTORY PENALTIES:   The penalty for the charge set forth in Count 1 is not more than five years imprisonment, a fine of not more than $250,000, not more than three years supervised release, and a $100 special assessment.

B.      SUPERVISED RELEASE:   Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.   Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, the defendant may be returned to prison for all or part of the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

4.      **WAIVERS**:   The defendant acknowledges that he has been advised of and fully understands the nature of the charges to which the plea is offered, the mandatory minimum

2

penalty provided by law, if any, and the maximum possible penalty provided by law.   The defendant further understands that by entering into this Agreement and Addendum, he is waiving certain constitutional rights, including, without limitation, the following:

      A.      The right to appeal or collaterally attack, to the full extent of the law, all non-jurisdictional issues, including any forfeiture or restitution order, as follows:

      (1)      the defendant waives the right to appeal all non-jurisdictional issues including, but not limited to, any issues relating to pre-trial motions, hearings and discovery and any issues relating to the negotiation, taking or acceptance of the guilty plea or the factual basis for the plea, including the sentence imposed or any issues that relate to the establishment of the Guideline range, except that the defendant reserves the right to appeal claims of prosecutorial misconduct and the defendant reserves the right to appeal the sentence if the defendant makes a contemporaneous objection because the sentence imposed is above the Guideline range that is established at sentencing;

      (2)      the defendant expressly acknowledges and agrees that the United States reserves its right to appeal the defendant's sentence under Title 18, United States Code, Section 3742(b) and *United States v. Booker*, 543 U.S. 220 (2005);

      (3)      the defendant waives all rights to collaterally attack the conviction and sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims based on ineffective assistance of counsel or prosecutorial misconduct;

      (4)      the defendant waives the right to have the sentence modified pursuant to Title 18, United States Code, Section 3582(c)(2);

(5)     the defendant waives the right to appeal the Court's determination of the amount of restitution and subsequent restitution order, if any; and,

(6)     the defendant waives the right to appeal the Court's determination of any forfeiture issues and subsequent forfeiture order, if any.

B.     The right to plead not guilty or to persist in that plea if it has already been made, and the right to a speedy and public trial before a jury;

C.     The right to be presumed innocent and to have the burden of proof placed on the United States to establish guilt beyond a reasonable doubt;

D.     The right to confront and cross examine witnesses;

E.     The right to testify in his own behalf if the defendant so chooses, or, the right to remain silent and not be compelled to testify, and to have that choice not used against the defendant;

F.     The right to call witnesses and to require those witnesses to appear by issuing subpoenas.

G.     Pursuant to Federal Rule of Criminal Procedure 11(b)(1)(O), the defendant understands that upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

5.     **STIPULATIONS:**   The United States and the defendant stipulate to the following:

A.     The parties agree that the base offense level is 14 pursuant to U.S.S.G. § 2C1.1(a)(1).

4

B.      The parties agree that the offense involved more than one bribe, resulting in a 2 level enhancement pursuant to U.S.S.G. § 2C1.1(b)(1).

C.      The parties agree that the value of the payment exceeds $95,000, resulting in an 8 level enhancement pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(E).

D.      The parties agree that the offense involved an elected public official, resulting in a 4 level enhancement pursuant to U.S.S.G § 2C1.1(b)(3).

E.      The defendant is eligible for a 2 point reduction for acceptance of responsibility unless the defendant takes any action between the entry of the guilty plea and imposition of the sentence that is inconsistent with acceptance of responsibility.   If the offense level is 16 or greater, the determination of whether the defendant is eligible for a third point reduction for acceptance of responsibility will be made by the United States at the time of sentencing.

F.      The parties stipulate that no other enhancements or reductions under Section 2C1.1, Chapter 3, or Chapter 5 of the Guidelines apply, other than those specifically set out in this agreement and its addendum.

G.      The defendant specifically waives any and all challenges to the searches, seizures, arrests, statements, and forfeitures that have taken place as of the date of the execution of this plea agreement by the defendant in this investigation by any entity, and in any forum where the offense may be pursued and/or forfeiture may be sought.   Defendant will assist in executing any requested waiver of challenge and relinquishment of rights to any and all assets that have been seized to date in this investigation by any participating agency or department, in any forum where the forfeiture may be sought.

H.      The defendant stipulates that the following facts are true:

5

At all times material, the Arkansas House of Representatives ("House") and Arkansas Senate ("Senate") were political subdivisions within the State of Arkansas. In fiscal years 2010-2014, the State of Arkansas received more than $10,000 per year in funds from the United States Government in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance. The Arkansas House consisted of 100 members, each elected from a specific electoral district from across the state. The Arkansas Senate consisted of 35 members each representing a specific electoral district. An Arkansas Representative's or Senator's duties included, but were not limited to: (a) investigating, studying, reporting, making recommendations, and amending or substituting measures or matters related to the jurisdiction of the House or Senate, or the Representative's or Senator's Committee; (b) scheduling and holding public hearings and meetings, summoning witnesses, and hearing testimony related to measures or matters within the jurisdiction of the House or Senate, or the Representative's or Senator's Committee; (c) drafting, filing, and voting on bills of law, resolutions, and substitute measures; and (d) appraising, approving, and overseeing budgets and the appropriation of state monies. Members of the Arkansas House and Senate were agents of the State of Arkansas as that term is defined in Title 18 U.S.C. § 666(d)(1). Arkansas House Representatives and Senators owe a fiduciary duty to provide honest services to the State of Arkansas and its citizens.

HENRY WILKINS IV ("WILKINS"), a resident of the Eastern District of Arkansas, served as a Representative of House District 17 in the Arkansas House of Representatives from 1999 to 2001, and again from 2011 to 2015. WILKINS also served as a Senator representing District 5 in the Arkansas Senate from 2001 to 2011. Both House District 17 and Senate District 5 are located in the Eastern District of Arkansas. WILKINS also served as a pastor at St. James United Methodist Church ("SJUMC") located in Pine Bluff, Arkansas.

"Entity A" was a Missouri-based nonprofit corporation that provided a variety of services to individuals in Missouri, Arkansas, Kansas, Oklahoma and Illinois, including mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services. "Person #1" was an employee of Entity A, serving as an executive overseeing Entity A's operations in the state of Arkansas. Person # 1 was also a registered lobbyist in the State of Arkansas and operated Lobbying Firms B, C and D. In 2013 and 2014, the lobbying firms operated by Person #1 represented and were paid by, among other clients, the Behavioral Health Provider's Association of Arkansas, Arkansas Youth Services Providers, CHMS Provider's Association of Arkansas, Entity A and Entity F to advance their interests in the legislature. Eddie Wayne Cooper ("Cooper") was an Arkansas State Representative from 2006 through 2011, and a lobbyist registered with the Arkansas Secretary of State from January 20, 2011 onward. On April 20, 2009, Entity A hired Cooper as a full-time employee, with the job title of "Regional Director." Cooper's employment with Entity A ended on April 26, 2017. From October 2009 through May 2015, Cooper also was a member of Entity A's Board of Directors. Cooper also worked for Lobbying Firm B as a lobbyist, and received payments from Lobbying Firm B as a contract employee.

Lobbying Firm B was an Arkansas C-corporation and lobbying organization registered with the Arkansas Secretary of State. Lobbying Firm B was solely owned and operated by Person #1, and purported to provide political services, including lobbying, consulting, and advocacy. On or about January 30, 2008, Person #1 opened a bank account ending in 2316 at Bancorp South in the name of Lobbying Firm B, with Person #1 as the sole signatory to the account. From July 1, 2013 to December 31, 2014, Entity A paid Lobbying Firm B in excess of $1,000,000.00. From 2012 through July 26, 2013, Entity F paid Lobbying Firm B in excess of $60,000. Lobbying Firm

C was a lobbying organization registered with the Arkansas Secretary of State, which listed a family member of Person #1 as its authorized representative. On or about November 4, 2009, Person #1 opened a bank account ending in 5171 at Bancorp South in the name of Person #1 doing business as Lobbying Firm C.  Person #1 was the sole signatory to the account.  On or about February 5, 2013, Person #1 opened a bank account ending in 3124 at Bancorp South in the name of Person #1 doing business as Lobbying Firm C.   Person #1 was the sole signatory to the account. Lobbying Firm D was a lobbying organization registered with the Arkansas Secretary of State, which listed Cooper as its authorized representative. On or about January 20, 2011, Person #1 and Cooper opened a bank account ending in 5467, with Person #1 and Cooper as the authorized signatories, at Bancorp South, in the name of Lobbying Firm D.

Entity E was an Arkansas non-profit corporation incorporated by "Person #2" in 1991 which provided training, mental health, substance abuse assessments, and anger management for youth released from the Division of Youth Services. Entity E was located in Pine Bluff, Arkansas, which is in the Eastern District of Arkansas.

Entity F was an Arkansas non-profit corporation located in Magnolia, Arkansas, which was a provider of youth services to delinquent and at-risk youth. "Person #3" served as the Executive Director of Entity F and caused Entity F to make payments to Lobbying Firm B and Lobbying Firm D. Between January 2012 and July 2013 Entity F paid Lobbying Firm B more than $60,000. Between August 2013 and November 2013, Entity F paid Lobbying Firm D approximately $32,000.   Person #4 is the adult child of Person #1 and was allegedly engaged as a lobbyist for Entity F beginning on or about July 1, 2013.

Person # 5, during all times material to this Information, served as Entity A's Chief Financial Officer. Person #5 had authority to approve and direct payments of funds, and enter into agreements on behalf of Entity A.

The Arkansas Department of Human Services (DHS) was an agency of the State of Arkansas that provided various services to individuals in the State of Arkansas to include behavioral health services, which were provided through the Division of Behavioral Health Services (DBHS).   The Arkansas Bureau of Legislative Research (BLR) is a non-partisan organization that services the Arkansas House and Senate by providing, amongst other services: general subject, legal, and budget research; drafting and amending of bills, resolutions, amendments and interim study proposals; committee staffing; and monitors rules as they are proposed by Arkansas state agencies. BLR's services are only available to Arkansas legislators.

The General Improvement Fund (GIF) was a fund established by the Arkansas General Assembly consisting of what was commonly referred to as "surplus" state revenues, which consisted of special revenues from various sources as specified by the General Assembly.  In 2013, the Arkansas General Assembly, pursuant to Act 818 and other Acts, appropriated GIF monies to DBHS for transfer to the Drug Abuse and Prevention Fund for behavioral health services for the citizens of Arkansas.   In the process of distributing the funds allocated to DBHS, certain members of the Arkansas State Legislature, acting in their official capacity, exerted influence over DBHS in directing GIF grants to specific applicants.

On or about November 2, 2010, WILKINS won the general election as a Representative in the Arkansas House of Representatives. WILKINS was re-elected to the Arkansas House of Representatives on or about November 6, 2012. While in the Arkansas House of Representatives, WILKINS served during the 89th General Assembly.   "Senator A" served as a Senator in the Arkansas Senate from 2011 to the present. Prior to his service in the Arkansas Senate, Senator A

served as a Representative in the Arkansas House of Representatives from 2000 until 2007. "Senator B" also served as a Senator in the Arkansas Senate during the 89th General Assembly.

On or about September 27, 1994, WILKINS opened the bank account ending in 4672 in the name of "Saint James United Meth. Church Discretionary Fund" at Pine Bluff National Bank, later renamed Relyance Bank ("Discretionary account"). WILKINS had signatory authority over the Discretionary account at all times relevant to this Information. WILKINS had a Discover credit card account ending in 3072 in the name of "HENRY WILKINS IV" from at least May 26, 2013, through April 25, 2014 ("Discover card"). WILKINS had a Discover credit card account ending in 1331 in the name of "HENRY WILKINS IV" from at least March 26, 2014, through June 25, 2014. WILKINS had a Discover credit card account ending in 5759 in the name of "HENRY WILKINS IV" from at least April 26, 2014, through June 25, 2014. WILKINS was the primary cardholder.

From in or about 2010 through in or about 2014, in the Eastern District of Arkansas and elsewhere, the defendant, HENRY WILKINS IV, together with Person #1, Person # 5 and others, did knowingly and unlawfully conspire, confederate, and agree together and with each other to corruptly give, offer, and agree to give, anything of value to any person, intending to influence and reward WILKINS, an agent of the state of Arkansas, in connection with a business, transaction, and series of transactions of the state of Arkansas involving $5,000 or more, in violation of 18 U.S.C. § 666(a)(2); for WILKINS, an agent of the state of Arkansas, to corruptly solicit and demand for the benefit of any person, and accept and agree to accept, anything of value from any person, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the state of Arkansas, involving $5,000 or more, in violation of 18 U.S.C. § 666(a)(1)(B); and to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the State of Arkansas of their right to the honest services of WILKINS, a Member of the Arkansas House and Senate, through bribery, in violation of 18 U.S.C. §§ 1343 and 1346.

WILKINS accepted cash from Person #1 and checks from Entity A, Lobbying Firm B, Lobbying Firm C, Lobbying Firm D, and others, deposited into the Discretionary account in exchange for providing and agreeing to provide favorable official action for Person #1, Entity A, and Entity F and others. The funds in the Discretionary account were used at WILKINS's direction and discertion. Person #1, directly and through Lobbying Firm B, Lobbying Firm C, Lobbying Firm D, and Entity A, and Person #5, through Entity A, enriched themselves by providing and directing monies to WILKINS, through the Discretionary account, in exchange for WILKINS taking and agreeing to take official action to benefit Person # 1, Entity A, and Entity F and others. Person #1 paid WILKINS cash on at least three occasions, including one occasion where Person #1 placed an envelope with $5,000 into Wilkins' vehicle. Two additional cash payments, totaling $5,000, were made by Person #1 to WILKINS near the Arkansas State Capitol Building. Person #5 paid WILKINS by directing monies in the form of at least one check in the amount of $30,000 from Entity A that was deposited into WILKINS's church's Discretionary account.

Person #1 would provide monies to WILKINS around times when Person #1 wanted WILKINS to perform official acts that were favorable to Person #1, Entity A and Entity F and others known and unknown. Person #1 described and explained the official acts Person #1 wanted WILKINS to perform in favor of Entity A and Entity F, in exchange for the monies being paid to WILKINS, including through conversations in person and by telephone. From February 2013 to December 2013 alone, Person #1 contacted, or attempted to contact, WILKINS by telephone approximately 344 times.

8

        In return for the cash and check payments, WILKINS performed and agreed to perform
official acts in his capacity as an Arkansas legislator that were favorable to Person #1, Entity A,
Entity F, and others.  WILKINS used the funds deposited into the Discretionary account of
SJUMC by Person #1, Entity A, Lobbying Firm B, Lobbying Firm C, Lobbying Firm D, and others
for his personal benefit.

        In furtherance of the conspiracy, and to accomplish its purposes, WILKINS, Person #1,
Person #3, Person #4, Person #5, Entity A, Lobbying Firm B, Lobbying Firm C, Lobbying Firm
D, Entity F and others committed acts in the Eastern District of Arkansas and elsewhere, including
the following payments deposited into the Discretionary account of SJUMC by checks:

| Date | Source | Amount |
|------|--------|--------|
| 6/24/2010 | Lobbying Firm B | $ 5,000.00 |
| 2/22/2012 | Lobbying Firm B | $ 3,000.00 |
| 6/8/2012 | Lobbying Firm B | $ 2,000.00 |
| 9/27/2012 | Lobbying Firm B | $ 1,500.00 |
| 10/16/2012 | Lobbying Firm B | $ 2,500.00 |
| 11/5/2012 | Lobbying Firm C | $ 2,500.00 |
| 12/19/2012 | Lobbying Firm C | $ 1,000.00 |
| 2/1/2013 | Lobbying Firm D | $ 1,000.00 |
| 3/11/2013 | Lobbying Firm B | $ 1,000.00 |
| 3/18/2013 | Lobbying Firm D | $ 1,000.00 |
| 3/29/2013 | Lobbying Firm B | $ 1,200.00 |
| 6/4/2013 | Lobbying Firm B | $ 1,500.00 |
| 6/14/2013 | Lobbying Firm B | $ 5,000.00 |
| 6/26/2013 | Lobbying Firm B | $ 4,000.00 |
| 8/12/2013 | Lobbying Firm B | $ 1,200.00 |
| 8/12/2013 | Lobbying Firm B | $ 1,200.00 |
| 9/12/2013 | Lobbying Firm B | $ 2,400.00 |
| 11/12/2013 | Lobbying Firm B | $ 2,000.00 |
| 12/18/2013 | Entity A | $ 30,000.00 |
| 2/3/2014 | Lobbying Firm B | $ 1,000.00 |
| 2/6/2014 | Lobbying Firm B | $ 1,000.00 |
| 5/8/2014 | Lobbying Firm B | $ 3,000.00 |
| 8/1/2014 | Lobbying Firm B | $ 1,000.00 |
| 8/12/2014 | Lobbying Firm B | $ 2,000.00 |
| 11/20/2014 | Lobbying Firm B | $ 1,000.00 |
| 1/16/2015 | Lobbying Firm B | $ 1,000.00 |
| 3/20/2015 | Lobbying Firm B | $ 1,000.00 |
| 8/13/2015 | Lobbying Firm B | $ 1,000.00 |
| 11/30/2015 | Lobbying Firm B | $ 1,000.00 |

| 1/20/2016 | Lobbying Firm B | $ | 1,000.00 |
|---|---|---|---|

The settling of each of the submitted checks listed below involved a writing, signal or sound that was transmitted, and was caused to be transmitted, by means of wire communications in interstate commerce.

### House Bill 1328 (HB 1328)

Person #1 on behalf of lobbying Firms B, C, and D represented youth service providers around the state of Arkansas during the 89th General Assembly and, among other things, lobbied to prevent the Arkansas Department of Youth Services (DYS) from adopting new rules and regulations deemed burdensome by the youth service providers and which were not contained in the original contracts between DYS and the youth service providers. Specifically, in late 2012 and throughout 2013, Person #1, in furtherance of his lobbying on behalf of youth service providers including Entity F, formulated legislation that would require the State to appear before legislative committees prior to changing youth service provider contracts. That bill would later become Act 321 of 2013.   On or about August 9, 2012, an employee with BLR emailed WILKINS with the subject line, "re: Bill Draft—DYS and Community Based Providers" and advised that he/she had a "lengthy conversation with [Person #1]" about the issues youth services providers are having with DYS and "as a result of my conversation with [Person #1], and the conversation we [meaning he/she and WILKINS] had on Tuesday, I have prepared the attached bill draft." Attached to this email was draft legislation that would later be filed as HB 1328.   On or about August 13, 2012, WILKINS forwarded the draft bill to Person #1, who then forwarded it on to Person #3 at Entity F.   On or about January 16, 2013, Person #1 forwarded the draft bill to Person #4 and Cooper stating, "Here is a copy of our legislation. We have [WILKINS] as our lead Sponsor in the House...".   On or about January 19, 2013, Person #1 wrote Senator A stating, "Hello my friend, Coop and I could use some help with you co-sponsoring this bill. Coop and I worked on it [sic] bring DYS before the legislature before they can make any changes to providers [sic] contract and services. We would like you to co-sponsor the bill for us...Things has [sic] not gotten any better with DYS working with the Providers."

On or about February 13, 2013, WILKINS filed House Bill 1328 ("HB 1328"). This bill was entitled "An Act to require DYS to appear before the legislature for any changes to Youth Provider contracts." On or about February 19, 2013, HB 1328 was amended to add co-sponsors. On or about February 22, 2013, HB 1328 passed the Arkansas House of Representatives with WILKINS voting in favor. On or about March 7, 2013, HB 1328 passed the Arkansas Senate and became Act 321 on March 11, 2013.   HB 1328 was favorable to the interests of the youth service providers including Entity F and thereby advanced the interests of Person #1, who was paid to lobby on their behalf. In exchange for the bribe payments from Person #1, Lobbying Firm B, Lobbying Firm C, and Lobbying Firm D, WILKINS agreed to advance the interests of the clients of those lobbying entities through this bill.

### House Bill 2227 (HB 2227)

On or about February 13, 2013, an employee of BLR emailed Person #1 with copy to Senator A and WILKINS stating, "[Person #1], [a]ttached are the shell bills you requested on behalf of [Senator A] and [WILKINS]. They have NOT been run for introduction yet. Once hear from the member's [sic], they will be run." Shell bill is a term that commonly refers to a bill that

is very general in nature and intended to be amended at a later time with more specific language, but filed because of certain legislative deadlines.  On or about February 13, 2013, Senator A wrote, "Please run for introduction. Im [sic] no[t] sure where we should start the bill (house or senate). [Person #1], any thoughts?"  On or about March 5, 2013, Person #1 wrote the employee of BLR, with copy to WILKINS and Senator A asking, "can you tell me if this bill (HB 2227) has been run for introduction and the bill number please. I can't find it anywhere. If it hasn't been ran yet, please hold off, we will have additional language tomorrow. Thank you so much, [Person #1]."  On or about March 7, 2013 at 8:51 a.m., Person #1 emailed an employee with BLR, Senator A and WILKINS stating, "here is the language for the shell bill. Will you please add this and prepare it for filing. Thank you very much." Attached to this email was a scan originating from an administrative office of Entity A. The title of the attached bill was "an Act to Avoid Unnecessary Expansion of Costs and Services under the Child Health Management Services Program."  On or about March 7, 2013, the BLR employee replied at 8:54 a.m., "of course. To be clear, you want the shell bill at this time, not the substantive language, correct?" At 8:59 a.m., the BLR employee then emailed Person #1, Senator A and WILKINS stating, "Please find the revised shell bill attached. If you are ready to run the bill for introduction, please let me know." Attached was the draft of a House Bill showing WILKINS as a sponsor entitled "An Act to avoid unnecessary expansion of costs and services under the child health management services program."  On or about March 7, 2013 at 9:22 a.m., Person #1 responded, "You may not need the shell bill since you have this language. We just need this language as filed bill.   Whatever is easier and you think it best." At 12:43 p.m., Person #1 emailed the BLR employee, Senator A and WILKINS stating, "[w]e need this filed please. We have the language for an amendment next week."

On or about March 11, 2013, WILKINS filed House Bill 2227 ("HB 2227"), a shell bill entitled "an Act to avoid unnecessary expansion in Medicaid costs and services to early intervention day treatment for children; to clarify that Code 20-48-101 and 20-48-105 apply to adults with developmental disabilities."  On or about March 21, 2013, HB 2227 was amended to include very similar language to the original bill Person #1 sent to the BLR employee on March 7, 2013.  The amendments were proposed by WILKINS.  On or about March 28, 2013, HB 2227 passed the Arkansas House of Representatives with WILKINS voting in favor of its passage.  On or about April 4, 2013, HB 2227 passed the Arkansas State Senate and eventually became Act 1017 on April 8, 2013.  HB 2227 was favorable to the interests of Person #1, Lobbying Firm B, Lobbying Firm C, Lobbying Firm D, Entity A and Entity F.   In exchange for the bribe payments from Person #1, Lobbying Firm B, Lobbying Firm C, and Lobbying Firm D, WILKINS agreed to advance the interests of the clients of those lobbying entities through this bill.

### House Bill 2209 (HB 2209)

Prior to the 89th General Assembly, behavioral health service providers were scored on their ability to adhere to regulations. Many behavioral health providers across the state of Arkansas, including Entity A and Entity F, by and through their lobbying representative, Person #1, maintained that the score card system was unfairly applied as a compliance mechanism. In the 89th General Assembly, House Bill 2209 ("HB 2209") was introduced by WILKINS in an effort to end the scoring system.  On or about March 11, 2013, WILKINS filed HB 2209, a shell bill, entitled "To Govern the Regulatory Compliance of Certain Medicaid Providers."  On or about March 28, 2013, WILKINS introduced an amendment to HB 2209, adding substantive language to the shell bill.  On or about April 1, 2013, WILKINS's amendment of HB 2209 that was introduced on or about March 28, 2013, was engrossed.

On or about April 4, 2013, Person #1 sent an email to representatives of Entity A with the subject line "HB 2209" and stated, "We will pass this on the House Floor this afternoon or tonight. After we pass this medicaid [sic] has ask[ed] for a meeting with Senator Wilkins and [Senator A] and all of us for a tradeoff not to run the bill in the Senate. The tradeoff will be; something else other than the [Youth Outcomes Questionnaire], enhanced reconsideration until any regs are propagated then we will have the full appeal process. This means they will quit giving us bs reviews that are unfounded. Also, [t]he color code to grade us will be gone forever, they will halt the episodes of care until they can produce data of how many kids are no long[er] getting services due to the episodes. They must have approval on all ergs [sic] thru public health." Attached to the email was a copy of HB 2209 introduced by WILKINS.  On or about April 4, 2013, HB 2209 passed the Arkansas House of Representatives with WILKINS voting in favor.

Later in the legislative session, an agreement was reached between Person #1 and the company providing the scoring system, and HB 2209 died in the Senate Committee on Public Health, Welfare and Labor.  HB 2209 was favorable to the interests of behavioral health providers including Entity A and thereby advanced the interests of Person #1who was paid to lobby on their behalf.  In exchange for the bribe payments from Person #1, Lobbying Firm B, Lobbying Firm C, and Lobbying Firm D, WILKINS agreed to advance the interests of the clients of those lobbying entities through this bill.

*GIF Funding and SB 507/Act 818*

On or about February 26, 2013, Senate Bill 507 ("SB 507") was introduced in the Arkansas Senate entitled "an Act to make an appropriation to the Department of Human Services—Division of Behavioral Health for Behavioral Health Services; and For Other Purposes," by State Senator "B."  On or about March 25, 2013, SB 507 passed the Arkansas Senate.  On or about April 2, 2013, SB 507 passed the Arkansas House of Representatives with WILKINS voting in favor.  On or about April 6, 2013, SB 507 was enacted as Act 818. Act 818 appropriated up to $1,000,000 from the General Improvement Fund to DHS-DBHS for "behavioral health services to the citizens of the State of Arkansas" for the fiscal year ending on June 30, 2014.  On or about April 22, 2013, WILKINS voted in favor of House Bill 2232 which provided funding for the GIF appropriation legislation that had been approved previously, including $365,000 in funding for SB 507/Act 818. On or about April 23, 2013, WILKINS voted in favor of Senate Bill 364 which provided funding for the GIF appropriation legislation that had been approved previously, including $365,000 in funding for SB 507/Act 818.

On or about July 1, 2013, Person #4 (the adult child of Person #1) was hired as a lobbyist for the non-profit Entity F and was to be paid $60,000 per year. Entity F concluded their financial relationship with Lobbying Firm B on July 26, 2013, and instead employed Person #4 as their lobbyist.   This hire was an indirect benefit to Person #1 who had been supporting Person #4. This lobbying activity was not disclosed to the United States government on Entity F's IRS Form 990 as required by law.   In or about September of 2013, WILKINS spoke to Person #2, a representative of Entity E, and discussed with him the opportunity to apply for GIF funding under Act 818.   On or about October 1, 2013, Entity E deposited $20,000 into the Discretionary account controlled by WILKINS.

On or about October 18, 2013, Person #1 sent an email to, amongst other individuals, Person #5, stating, "Act 818 is from [Senator B] (Senator WILKINS [sic] money but [Senator B's] bill). It is for [Entity A] for $150,000.00 . . . this is [Senator B's] bill but WILKINS' money."  On or about October 29, 2013, Person #2, on behalf of Entity E, applied for $100,000 in GIF funds

available under Act 818.   On or about October 31, 2013, WILKINS sent a letter of support on behalf of Entity E to receive Act 818 GIF funds.   On or about October 31, 2013, WILKINS sent a letter of support on behalf of Entity A to receive Act 818 GIF funds.   On or about October 31, 2013, WILKINS sent a letter of support on behalf of Entity F to receive Act 818 GIF funds.   On or about November 1, 2013, Person #3, on behalf of Entity F, applied for $99,895.67 in GIF funds available under Act 818.   On or about November 1, 2013, Person #1, on behalf of Entity A applied for $200,000 in GIF funds available under Act 818.

On or about December 5, 2013, DBHS made disbursements from the funds appropriated by Act 818 to selected grant applications. From those funds, Entity A was granted $122,564.93, Entity E was granted $61,282.00, and Entity F was granted $61,218.06.   Between December 23 and December 31, 2013, WILKINS wrote checks to himself from the Discretionary account for over $7,000 and paid approximately $10,602.88 toward the balance on his personal Discover card. WILKINS accepted payments from Person #1, Entity A, Lobbying Firm B, Lobbying Firm C, and Lobbying Firm D and in exchange, WILKINS performed and agreed to perform official acts in his capacity as an Arkansas legislator that were favorable to Person #1, Person #5, Entity A, and Entity F, including but not limited to, using his official position as an Arkansas legislator to vote for the passage of legislation appropriating GIF monies to DBHS and then using his official position to influence the awarding of GIF grants to Entity A, and Entity F.

WILKINS, together with Person #1, Person # 5 and others, did take steps and committed acts to conceal the conspiracy. Such acts included, but were not limited to, the issuance of bribe payments to the Discretionary Account at SJUMC that was under WILKINS's control instead of to WILKINS directly.   Additionally, in or about 2014, Person #1 contacted WILKINS requesting to meet with WILKINS. WILKINS agreed to meet with Person #1.   During the meeting between Person #1 and WILKINS in or about 2014, Person #1 informed WILKINS that Person #1 was being investigated by the Federal Bureau of Investigation and that Person #1 had sought advice from attorneys in Kansas City. Person #1 stated to WILKINS that Person #1 needed to continue making payments to WILKINS's Discretionary fund even after WILKINS left the Arkansas legislature. Person #1 stated to WILKINS words to the effect that Person #1 needed to do this to make it "look like I wasn't paying you."   WILKINS left the legislature at the end of the Arkansas 89th General Assembly, which records indicate was in session until July 2014. WILKINS was replaced in office as the House Representative of Arkansas House District 17 in January 2015. Person #1 continued to direct payments to WILKINS's Discretionary account from August 1, 2014 until at least January 20, 2016, even after WILKINS left office to conceal the true nature of the bribes previously paid to WILKINS.   In or about February 20, 2015, in response to questions from auditors asking what the December 13, 2014 payment from Entity A to WILKINS's Discretionary account was for, Person #5 stated it was a "Donation to a youth summer program in Pine Bluff AR, United Methodist Church.   That is about it."

The parties understand that the Court is not bound by these stipulations.   The defendant further understands that if the Court does not accept this Plea Agreement, the defendant is not entitled to withdraw the guilty plea or otherwise be released from defendant's obligations under this Agreement and Addendum.

6.      **SENTENCING GUIDELINES:**   It is specifically understood by the defendant that the Sentencing Guidelines are not mandatory but are advisory, and that the Court is to consult them in determining the appropriate sentence. The defendant understands that the determination of the applicability of the Guidelines and of the appropriate sentence will be made by the Court.   The defendant is aware that any estimate of the probable sentencing range under the Sentencing Guidelines that the defendant may have from the defendant's counsel, the United States, or the Probation Office, is merely a prediction, not a promise, and is not binding on the United States, the Probation Office, or the Court.   The United States makes no promise or representation concerning what sentence the defendant will receive and the defendant cannot withdraw a guilty plea, or otherwise avoid the defendant's obligations under this Agreement and Addendum, based upon the actual sentence imposed by the Court.   The parties understand and agree that if the guideline range is greater or less than the defendant or the United States expected it to be, and/or the sentence imposed by the Court is greater or lesser than anticipated, neither the defendant nor the United States will be allowed to withdraw, nor request withdrawal of, the guilty plea, nor be excused from any obligation under this Agreement and Addendum.

7.      **ALLOCUTION:**   The United States reserves the right to bring any and all facts which it believes are appropriate to the attention of the Court.

8.      **COOPERATION IN THE SENTENCING PROCESS:**

A.      The defendant agrees to truthfully provide all information to the Probation Office as is needed for preparation of the pre-sentence report, including, but not limited to, criminal history information.   The defendant shall voluntarily provide a complete and truthful written accounting of the defendant's criminal history to the Probation Office.

14

B.     The defendant agrees to execute all waivers necessary for the preparation of the pre-sentence report.

C.     The defendant understands and acknowledges that the defendant's obligation of disclosure regarding criminal history is not limited to arrests and convictions reported in computer databases, but requires the defendant to disclose all arrests and/or convictions, including any juvenile matters, regardless of whether the defendant believes the arrest/conviction counts under the Sentencing Guidelines.

D.     The defendant is required to comply with these obligations no later than the expiration of the date on which objections to the pre-sentence report are due.

9.     **FINANCIAL MATTERS:**

A.     FINANCIAL STATEMENT:   The defendant agrees to fully and truthfully complete a Financial Statement provided by the United States Probation Office.

B.     FINES:   The defendant understands that unless the Court determines that the defendant is financially unable to pay a fine, the Court must impose a fine pursuant to the Sentencing Reform Act of 1984.

C.     SPECIAL PENALTY ASSESSMENT:   The defendant agrees to pay to the United States a special assessment of $100.00 per count, as required by Title 18, United States Code, Section 3013.   This special assessment is to be paid by bank cashier's check or money order as directed by the Court.   Cashier's checks or money orders should be made payable to "Clerk, United States District Court."

D.     RESTITUTION:   The defendant acknowledges that restitution is mandatory pursuant to Title 18, United States Code, Section 3663A.   The defendant agrees to the entry of an order of restitution for the full amount of the victims' losses, regardless of

15

whether charges relating to such losses will be excluded or dismissed as part of this plea agreement.    At this time, the United States and the defendant agree that they will leave the determination regarding the amount of restitution payable by the defendant to the Court.

      E.    <u>FINANCIAL INFORMATION</u>:  The defendant agrees to fully disclose all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or third party.    The defendant agrees to truthfully complete the financial statement form provided by the United States Attorney's Office for the Eastern District of Arkansas by the date of defendant's entry of a guilty plea, sign it under penalty of perjury, and provide it to the United States Attorney's Office for the Eastern District of Arkansas.    The defendant agrees to provide updates with any material changes in circumstances, as described in 18 U.S.C. § 3664(k), which occur prior to sentencing, within seven days of the event giving rise to the changed circumstances.    Prior to sentencing, the defendant agrees to notify the Assistant United States Attorney and the Financial Litigation Unit of the United States Attorney's Office for the Eastern District of Arkansas before the defendant transfers any interest in property with a value exceeding $1,000 owned directly or indirectly, individually or jointly, by the defendant, including any interest held or owned under any name, including trusts, partnerships, and corporations.    The defendant expressly authorizes the United States Attorney's Office to obtain a credit report on him.    The defendant agrees to provide waivers, consents or releases requested by the United States Attorney's Office to access records to verify the defendant's financial information.    The defendant also authorizes the United States Attorney's Office to inspect and copy all financial documents and information held by the United States Probation Office.

10.     **DOUBLE JEOPARDY AND SUCCESSIVE PROSECUTION**:   The United States Attorney for the Eastern District of Arkansas, the United States Attorney for the Western District of Arkansas, the United States Attorney for the Western District of Missouri, and the Criminal Division, Public Integrity Section, will bring no further charges against the defendant for any acts or conduct arising out of the events described in the Information, which is the subject of this action, unless the defendant breaches this Agreement and Addendum.

11.     **RECORDS:**   The defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. Section 552, or the Privacy Act of 1974, 5 U.S.C. Section 552a.

12.     **CIVIL CLAIMS BY THE GOVERNMENT:**   Except to the extent otherwise expressly specified herein, this Agreement and Addendum does not bar or compromise any civil or administrative claim pending or that may be made against the defendant, including but not limited to tax matters.

13.     **EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT AND ADDENDUM**:

       A.     Defendant acknowledges and understands that if the defendant violates any term of this Agreement and Addendum, engages in any further criminal activity prior to sentencing, or fails to appear for any subsequent proceeding including sentencing, the United States shall have, in addition to all other rights and remedies otherwise available, the right to:

       (1)     terminate this Agreement and Addendum; or

       (2)     proceed with this Agreement and Addendum and

        (a)     deny any and all benefits to which the defendant would otherwise be entitled under the terms of this Agreement and Addendum; and/or

        (b)     advocate for any sentencing enhancement that may be appropriate.

        B.     In the event the United States elects to terminate this Agreement and Addendum, the United States shall be released from any and all obligations hereunder. The defendant acknowledges and understands that the agreement of the United States to dismiss any charge is conditioned upon final resolution of this matter. If this Agreement and Addendum is terminated or if the defendant's conviction ultimately is overturned, then the United States retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this Agreement and Addendum.

        C.     The defendant hereby knowingly and voluntarily waives any defense based upon the applicable statute of limitations and/or the Speedy Trial Act, for any charges reinstated or otherwise filed against the defendant as a result of defendant's breach of this Agreement and Addendum, so long as the United States initiates any otherwise time barred action within one year of termination or revocation of this Agreement and Addendum.

        D.     In the event that the Agreement and Addendum is terminated or if the defendant successfully moves to withdraw his plea, any statement made by the defendant in negotiation of, or in reliance on this Agreement and Addendum, including this Agreement, the stipulations in paragraph 5 of this Agreement, and the plea colloquy, but excepting statements made pursuant to any proffer agreement entered into between the parties:

(1)     may be used in the United States' case in chief and to cross examine the defendant should he testify in any subsequent proceeding; and/or

(2)     any leads derived therefrom may be used by the United States. The defendant waives any and all rights to the contrary and shall assert no claim under the United States Constitution, any statute, or any rule of procedure or evidence to the contrary, including Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f). Defendant has been advised of his rights pursuant to Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(f) and waives these rights.

14.     **PARTIES:**   This Agreement and Addendum is binding only upon the United States Attorney for the Eastern District of Arkansas; the United States Attorney for the Western District of Arkansas Duane (Dak) Kees, by and through Assistant United States Attorney Ben Wulff; the United States Attorney for the Western District of Missouri Timothy A. Garrison, by and through Assistant United States Attorney Steven M. Mohlhenrich; and the United States Department of Justice, Criminal Division, Public Integrity Section, Acting Chief AnnaLou Tirol, by and through Trial Attorney Marco Palmieri; and the defendant.   It does not bind any United States Attorney outside the United States Attorney for the Eastern District of Arkansas, the United States Attorney for the Western District of Arkansas, and the United States Attorney for the Western District of Missouri, nor does it bind any other federal, state or local prosecuting, administrative, or regulatory authority.

15.    **MISCELLANEOUS:**

A.    <u>MODIFICATION</u>:   No term or provision contained herein may be modified, amended or waived except by express written agreement signed by the party to be bound thereby.

B.    <u>HEADINGS AND CAPTIONS</u>:   Subject headings and captions are included herein for convenience purposes only and shall not affect the interpretation of this Agreement and Addendum.

C.    <u>WAIVER</u>:   No waiver of a breach of any term or provision of this Agreement and Addendum shall operate or be construed as a waiver of any subsequent breach or limit or restrict any other right or remedy otherwise available.   Any waiver must be expressly stated in writing signed by the party to be bound thereby.

D.    <u>RIGHTS AND REMEDIES CUMULATIVE</u>:   The rights and remedies of the United States expressed herein upon any breach hereunder by the defendant are cumulative and not exclusive of any rights and remedies otherwise available to the United States in the event of any breach of this Agreement and Addendum by defendant.

E.    <u>JOINT NEGOTIATION</u>:   This Agreement and Addendum has been mutually negotiated by the parties hereto, and any uncertainty or ambiguity existing herein shall not be interpreted against any party by reason of its drafting of this Agreement and Addendum, but instead shall be interpreted according to the application of the general rules of interpretation for arms length agreements.

16.    **NO OTHER TERMS:**   This document and the Addendum completely reflect all promises, agreements and conditions made between the parties, constitute the entire agreement

between the parties and supersedes any and all prior agreements or understandings between the

parties, oral or written, with respect to the subject matter hereof.

17.    **APPROVALS AND SIGNATURES**:

A.    DEFENDANT:   The defendant has read this Agreement and Addendum

and carefully reviewed every part of it with his attorney.   The defendant understands and

voluntarily agrees to the terms and condition of this Agreement and Addendum.   Further, the

defendant has consulted with his attorney and fully understands his rights with respect to the

provisions of the United States Sentencing Guidelines which may apply to this case.   No other

promises or inducements have been made to the defendant, other than those expressly contained

in this Agreement and Addendum.   In addition, no one has threatened or forced the defendant in

any way to enter into this Agreement and Addendum.   Defendant further acknowledges that

defendant has entered into this Agreement and Addendum, consciously and deliberately, by

defendant's free choice, and without duress, undue influence or otherwise being forced or

compelled to do so, and this Agreement and Addendum constitutes the legal, valid and binding

obligation of the defendant, fully enforceable against defendant in accordance with its terms.

Finally, the defendant is satisfied with the representation of his attorney in this case.

B.    DEFENSE COUNSEL:   Defense counsel acknowledges that he is the

attorney for the defendant, and that he has fully and carefully discussed every part of this

Agreement and Addendum with the defendant.   Further, defense counsel has fully and carefully

advised the defendant of the defendant's rights, of possible defenses, and of the consequences of

entering into this Agreement and Addendum, including the possible consequences of not

complying with this Agreement and Addendum.   To counsel's knowledge, the defendant's

decision to enter into this Agreement and Addendum is an informed and voluntary decision.

DATED this ___30th___ day of ___April___, 2018.

CODY HILAND
United States Attorney

STEPHANIE MAZZANTI (2006298)
PATRICK C. HARRIS (85069)
BEN WULFF (2005190)
Assistant U.S. Attorneys
P. O. Box 1229
Little Rock, AR   72203
Telephone:   501-340-2600
E-mail: Stephanie.Mazzanti@usdoj.gov

HENRY WILKINS IV
Defendant

BILL STANLEY
Attorney for Defendant

ANNALOU TIROL
Acting Chief, Public Integrity Section

MARCO A. PALMIERI
D.C. Bar No. 981788
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice
1400 New York Ave., N.W., 12th Floor
Telephone:   202-307-1475
E-mail: marco.palmieri@usdoj.gov